# In the United States Court of Federal Claims

No. 13-478T
(Filed: February 29, 2016)

|  |  |  |
|---|---|---|
| 8x8, INC., | ) | Keywords: Summary Judgment; Tax Refund; I.R.C. § 6415; Federal Communications Excise Tax; I.R.C. § 4251; Prepaid Telephone Card; Treas. Reg. § 49.4251-4; I.R.S. Notice 2006-50 |
|  | ) |  |
|  | ) |  |
| Plaintiff, | ) |  |
|  | ) |  |
| v. | ) |  |
|  | ) |  |
| THE UNITED STATES OF AMERICA, | ) |  |
|  | ) |  |
|  | ) |  |
| Defendant. | ) |  |
|  | ) |  |

*Anthony Gulotta*, Gulotta Law Group, P.C., Harrisburg, PA, for Plaintiff.

*Benjamin C. King, Jr.*, Attorney of Record, Court of Federal Claims Section, with whom were *G. Robson Stewart*, Assistant Chief, Court of Federal Claims Section, *David I. Pincus*, Chief, Court of Federal Claims Section, and *Caroline D. Ciraolo*, Assistant Acting Attorney General, Tax Division, United States Department of Justice, Washington, DC, for Defendant.

## **OPINION AND ORDER**

**KAPLAN, Judge.**

Plaintiff 8x8, Inc. (8x8), a provider of Voice over Internet Protocol (VoIP) services, seeks a refund of more than $1 million in taxes it remitted to the United States pursuant to I.R.C. § 4251, which imposes an excise tax on certain "communications services." Currently before the Court are the parties' cross-motions for summary judgment.

For the reasons set forth below, the Court concludes based on the undisputed facts that 8x8 is not entitled to obtain a refund because it acted as a "collector" of the taxes at issue within the meaning of I.R.C. § 6415(a). Under that provision, a collector may obtain a refund from the Internal Revenue Service (IRS) only if it has repaid the amount of the taxes to the person from whom they were collected, or has obtained that person's consent to receive the refund. Neither condition has been met in this case.

Moreover, the Court finds unpersuasive 8x8's argument that it is nonetheless entitled to a refund in accordance with certain laws, regulations, and IRS Bulletins

governing the refund of excise taxes paid by sellers of prepaid telephone cards and "similar arrangement[s] which permit[] [their] holder[s] to obtain communications services and pay for such services in advance." I.R.C. § 4251(d)(1), (3); see Treas. Reg. § 49.4251-4. The services 8x8 provided to its customers were not similar to prepaid telephone cards, and even if they were, 8x8 would still not be entitled to a refund because, again, it did not pay the taxes for which a refund is sought; it collected them. Accordingly, the government's cross-motion for summary judgment is **GRANTED**, and 8x8's motion is **DENIED**.

## BACKGROUND

### I.     The Federal Communications Excise Tax on Toll Telephone Service

The federal government levies an excise tax on certain types of communications services, including "toll" telephone service. See I.R.C. § 4251. This tax is known as the Federal Communications Excise Tax (FCET). Ordinarily, the person who uses the communications service pays the tax. See Treas. Reg. § 49.4251-2(c) ("The [FCET is] payable by the person paying for the services rendered . . . ."). But the government does not collect the tax directly from the user. Instead, "the person rendering the services" must "collect the tax and return and pay [it] over." Id. For toll telephone service, the person rendering the service is the telephone service provider (or "carrier"). Thus, the carrier acts as a "collector" of the FCET.

Congress has defined "toll" telephone service as any "telephone quality communication" for which the charge "varies in amount with the distance and elapsed transmission time of each individual communication." I.R.C. § 4252(b)(1). When Congress adopted this definition in 1965, AT&T held a legally sanctioned monopoly over long distance phone services in the United States. See Excise Tax Reduction Act of 1965, Pub. L. 89-44, § 302, 79 Stat. 136, 146 (1965); see also Reese Bros., Inc. v. United States, 447 F.3d 229, 233–34 (3d Cir. 2006). The statute thus "reflect[ed] an effort by Congress to conform the definition to the long-distance pricing methods then in place." See Reese Bros., 447 F.3d at 234.

By the late 1990s, AT&T's monopoly was no more, and the rates charged by most carriers for long distance calls no longer varied with distance; instead, rates were set based only on a call's duration. See OfficeMax, Inc. v. United States, 428 F.3d 583, 586 (6th Cir. 2005). Nevertheless, the IRS continued to take the position that such long distance calls constituted toll telephone service and thus remained subject to the FCET. Id. Litigation ensued. See id. at 587; see also Reese Bros., 447 F.3d at 234; Am. Bankers Ins. Grp. v. United States, 408 F.3d 1328, 1331 (11th Cir. 2005); Nat'l R.R. Passenger Corp. v. United States, 431 F.3d 374, 376 (D.C. Cir. 2005). After several courts of appeals rejected the IRS's position, the agency acquiesced and acknowledged in 2006 that "a telephonic communication for which there is a toll charge that varies with elapsed transmission time and not distance . . . is not taxable toll telephone service." See I.R.S. Notice 2006-50, § 1(a), 2006-25 I.R.B. 1141.

In the same notice, the IRS set forth a process that allowed taxpayers to obtain a refund of the FCET that had been exacted on non-taxable services during the period between February 23, 2003, and August 1, 2006.[1] Id. § 5(a). For purposes of the refund process, the IRS stated that it would treat not only long distance service as non-taxable service, but also "bundled" service—that is, "local and long distance service provided under a plan that does not separately state the charge for the local telephone service." Id. § 3(a), (d). Examples of bundled service included "Voice over Internet Protocol service, prepaid telephone cards, and plans that provide both local and long distance service for either a flat monthly fee or a charge that varies with the elapsed transmission time for which the service is used." Id. § 3(a). Taxpayers could request refunds through their tax returns for the 2006 tax year or by subsequently filing an amended return. See id. § 5(d). The IRS permitted taxpayers to file amended returns requesting these refunds through July 27, 2012. See I.R.S. Announcement 2012-16, 2012-18 I.R.B. 876.

## II.   8x8's Voice Over Internet Protocol Services

The facts in this case are not in dispute. 8x8 provides VoIP services that permit users to make voice calls over a broadband internet connection instead of a traditional phone line. Joint Stip. of Facts (JS) ¶ 5, ECF No. 26; see also Minn. Pub. Utils. Comm'n v. FCC, 483 F.3d 570, 574 (8th Cir. 2007); Voice Over Internet Protocol (VoIP), FCC.gov, https://www.fcc.gov/general/voice-over-internet-protocol-voip (last visited February 24, 2016). To place a VoIP call, the user's speech must be converted into an internet-compatible digital signal.[2] See Voice Over Internet Protocol (VoIP), supra. Thus, to use 8x8's VoIP service, 8x8's customers first had to plug their phones into a proprietary "digital terminal adapter" (DTA), which they could purchase from 8x8 or another retailer. See JS ¶¶ 15–17.

When a customer placed a call, 8x8 would route the outgoing digital signal to a digital "switch site" that it owned. See Compl. ¶ 11, ECF No. 1; JS ¶ 20. At the switch site, 8x8 handed off most of the calls to Level 3 Communications, LLC, or Global Crossing, two larger, traditional phone carriers, from which it purchased phone service in

---

[1] On April 9, 2012, Notice 2006-50 was prospectively vacated as a result of unrelated litigation. See In re Long-Distance Tel. Serv. Fed. Excise Tax Refund Litig., 853 F. Supp. 2d 138, 145 (D.D.C. 2012). Because this vacatur was not retroactive, it does not affect the outcome of this case.

[2] Specifically, the user's speech must be converted into digital packets of information, which are then separately routed to the destination and reassembled in the correct order. See Rus Shuler, How Does the Internet Work?, https://web.stanford.edu/class/msande91si/www-spr04/readings/week1/InternetWhitepaper.htm (last visited February 24, 2016); see also Def.'s Mem. in Supp. of its Cross-Mot. for Summ. J. (Def.'s Mem.) Ex. 5 at 12–13, ECF No. 40 (explaining the data transmission portion of 8x8's VoIP service). This contrasts with traditional (or analog) phone service, which connects the callers over a single, dedicated circuit.

bulk.³ See JS ¶ 10; Def.'s Mem. Ex. 5 at 12. If necessary, these carriers would convert the digital signal to an analog signal and connect it to the existing network of physical phone lines. Def.'s Mem. Ex. 5 at 12 (explaining that the carriers "have something called a gateway that converts [the digital signal] from [Internet Protocol] into the public telephone network, so it takes it from being on the internet to being on a physical copper line").

To sign up for 8x8's service, customers purchased a DTA loaded with 8x8's proprietary software and then enrolled in a "subscription plan" online. JS ¶¶ 15–17. To secure service, customers were required to agree to 8x8's lengthy "Terms and Conditions of Service" and provide a credit card number. Id. ¶ 17. Upon enrollment, 8x8 provided customers with a ten-digit code that they could use to activate the service. Id.

The Terms and Conditions contained, among other things, a detailed statement establishing the customer's liability to pay any applicable taxes. See Def.'s Mem. Ex. 2 at 6 ¶ 5.5; JS ¶ 19. Specifically, it represented that "[p]rices for the Services do not include any customs duties, sales, use, value added, excise, federal, state, local, public utility or other similar taxes." JS ¶ 19. Further, it stated that "[a]ll such taxes shall be paid by [the] End User and will be added to any amounts otherwise charged to [the] End User." Finally, it noted that "[i]f any amounts paid for the Services by [the] End User are refunded by 8x8, applicable taxes may not be refundable." Id.

After a customer signed up, 8x8 would bill the customer's credit card on a recurring basis each month until the customer cancelled service. See id. ¶¶ 13, 22–24; Pl.'s Mem. in Supp. of Pl.'s Mot. for Summ. J. (Pl.'s Mem.) at 4, ECF No. 29. 8x8's customers could place both domestic and international calls. JS ¶¶ 5–6. Many customers' service plans allowed them to make an essentially unlimited number of local and long distance calls within the United States—a service 8x8 called "domestic bundled telephone service."⁴ Id. ¶¶ 5–6, 21. On the other hand, some customers enrolled in "usage based" plans. Id. ¶ 5. These plans entitled customers to a set number of minutes of service each month at a set rate. Id. If they exceeded their set number of minutes, 8x8 would bill them later. Id. ¶ 13.

8x8's customers had online access to monthly invoices detailing their charges. Id. ¶ 24. Customers' invoices included their service fee for the upcoming month and any charges for international calls made during the previous month. Id. ¶ 23. Customers with usage based plans who exceeded their plan amounts were also invoiced for the additional minutes they had used the previous month. Id. ¶¶ 13, 23. In addition to these service-

---

³ VoIP calls from one 8x8 customer to another remained inside 8x8's network and were not handed off to the carriers. See Def.'s Mem. Ex. 5 at 14.

⁴ While the parties' stipulation describes the monthly domestic calling plans as "unlimited," it also states that "the amount of service was limited to reasonable personal use within the one month period for which service had been prepaid." JS ¶ 21.

4

related charges, the monthly invoices "separately stated" the "[FCET] applicable to the telephone service used by the customer that month." Id. ¶ 25.

### III.   8x8's FCET Payments and Its Claims in This Case

Between March 1, 2003, and July 30, 2006, 8x8 remitted to the government more than $1 million in FCET taxes related to its VoIP services. JS ¶ 7. During this period, 8x8 also filed exemption certificates under I.R.C. § 4253(f) with the carriers from which it purchased bulk phone service, Level 3 Communications, LLC, and Global Crossing.[5] Id. ¶ 11. Accordingly, those companies did not collect any FCET payments from 8x8. See id.; Def.'s Mem. at 1.

In August 2010, 8x8 filed an amended tax return for 2006 requesting a refund of the FCET it had remitted. Compl. ¶ 22. The IRS asked 8x8 for additional information and eventually denied the bulk of 8x8's refund request in July 2011. Id. ¶¶ 23–28. 8x8 administratively appealed the decision without success. Id. ¶¶ 29–35. It then filed its refund claim in this Court on July 17, 2013. ECF No. 1. After engaging in discovery, the parties filed a joint stipulation of facts, ECF No. 26, followed by cross-motions for summary judgment, ECF Nos. 29, 40. The cross-motions were argued on February 9, 2016, and are now ripe for decision.

## DISCUSSION

### I.   Jurisdiction

The Tucker Act grants the Court of Federal Claims jurisdiction over "any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." 28 U.S.C. § 1491(a)(1). It is well established that this jurisdictional grant extends to suits for the refund of taxes remitted to the Treasury. Ledford v. United States, 297 F.3d 1378, 1382 (Fed. Cir. 2002); see also Ont. Power Generation v. United States, 369 F.3d 1298, 1301 (Fed. Cir. 2004); Shore v. United States, 9 F.3d 1524, 1525 (Fed. Cir. 1993).

This Court's exercise of that jurisdiction is subject, however, to I.R.C. § 7422(a), which requires that the taxpayer file a timely refund claim with the IRS before bringing a civil action. After filing a claim with the IRS, the taxpayer must wait at least six months before filing a complaint in the Court of Federal Claims (unless the IRS disallows the claim sooner). Id. § 6532. In this case, it is undisputed that 8x8 has met these exhaustion requirements. See Compl. ¶¶ 23–35; JS ¶ 3. The Court therefore has jurisdiction over 8x8's tax refund suit.

---

[5] I.R.C. § 4253(f) creates an exemption for "the amount paid for any toll telephone service . . . to the extent that the amount so paid is for use by a common carrier, telephone or telegraph company, or radio broadcasting station or network in the conduct of its business as such."

## II. The Parties' Cross-Motions for Summary Judgment

### A. Standard for Summary Judgment

The standards for granting summary judgment are well established. The Court may grant summary judgment when there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. Rules of the Court of Federal Claims 56(a); see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–52 (1986). A fact is material if it "might affect the outcome of the suit under the governing law." Anderson, 477 U.S. at 248. An issue is genuine if it "may reasonably be resolved in favor of either party." Id. at 250.

The moving party bears the burden of establishing the absence of any genuine issue of material fact, and all significant doubts regarding factual issues must be resolved in favor of the party opposing summary judgment. Mingus Constructors, Inc. v. United States, 812 F.2d 1387, 1390 (Fed. Cir. 1987). "The fact that both parties have moved for summary judgment does not mean that the court must grant judgment as a matter of law for one side or the other; summary judgment in favor of either party is not proper if disputes remain as to material facts." Id. at 1391. Further, the court should act with caution in granting summary judgment and may deny summary judgment "where there is reason to believe that the better course would be to proceed to a full trial." Anderson, 477 U.S. at 255.

In this case, the material facts have been stipulated by the parties and are not in dispute. The sole issues before the Court are legal ones. Thus, the case is ripe for summary judgment.

### B. Merits

#### 1. Standing to Secure Refund as Tax Collector

The first issue presented on the cross-motions for summary judgment is whether, as the government contends, 8x8 is precluded from seeking a refund of the excise taxes it remitted to the IRS by virtue of the conditions that I.R.C. § 6415(a) imposes upon requests for refunds by persons who act as tax collectors. That provision states as follows:

> Credit or refund of any overpayment of tax imposed by section 4251 . . . may be allowed to the person who collected the tax and paid it to the Secretary if such person establishes, under such regulations as the Secretary may prescribe, that he has repaid the amount of such tax to the person from whom he collected it, or obtains the consent of such person to the allowance of such credit or refund.

I.R.C. § 6415(a).

Thus, pursuant to section 6415(a), a tax collector may not secure a refund of taxes it collected from a taxpayer and remitted to the IRS on their behalf where it has neither

repaid the taxpayer nor obtained the taxpayer's consent. The purpose of the provision is "to preclude what would otherwise result in unjust enrichment." Gumpert v. United States, 296 F.2d 927, 929 (Ct. Cl. 1961); see also Locus Telecomms., Inc. v. United States, 99 Fed. Cl. 641, 649 (2011) (purpose of § 6415(a) is "to insure that the person applying for a refund has not already billed those for whom it paid the tax"). Therefore, to secure a tax refund, a plaintiff must show either "that they have complied with the provisions of the statute . . . or that they have borne the economic burden of the tax." Gumpert, 296 F.2d at 929; see also Epstein v. United States, 357 F.2d 928, 937 (Ct. Cl. 1966) ("[R]ecovery [of a tax refund] may be had only if [the] plaintiff can show that he himself ha[s] borne the economic burden of the taxes by paying them out of his own pocket and ha[s] not collected them from members.").

"Whether or not plaintiff bore the economic burden [of the tax] is a factual question." Epstein, 357 F.2d at 937. In this case, the undisputed facts establish that 8x8 did not bear the economic burden of the taxes it remitted to IRS; indeed, 8x8 does not seriously argue otherwise. Thus, the Terms and Conditions of 8x8's agreement with its customers explicitly stated in no uncertain terms that the customer, and not 8x8, was responsible for paying the excise tax. See JS ¶ 19. Specifically, the Terms and Conditions stated that "[p]rices for the Services do not include any customs duties, sales, use, value added, excise, federal, state, local, public utility or other similar taxes," and that "[a]ll such taxes shall be paid by [the] End User." Id. Likewise, 8x8 listed the tax as a separate charge on its customers' monthly invoices. Id. ¶ 25.

These facts alone are sufficient to establish that 8x8 did not bear the economic burden of the taxes it remitted to the IRS. See Gumpert, 296 F.2d at 929 (operator of a tour business acted as a collector where tickets for the tours "reflected the tax, in that there was a place for the price of the tour and a place for the amount of the tax"); Westside Cellular, Inc. v. United States, 573 F. Supp. 2d 1002, 1007 (N.D. Ohio 2008) (provider of cellular services that "billed its customers for the excise tax on monthly billing statements" acted as a collector). And in this case there is additional evidence that 8x8 was a tax collector because it represented to the carriers from which it bought bulk phone service that it was exempt from paying the tax under I.R.C. § 4253(f) because it provided telephone service in the course of its business. See JS ¶ 11. As the government correctly observes, these claims of exemption run counter to an assertion by 8x8 that it paid the tax itself. Def.'s Mem. at 11–12; see also Westside Cellular, 573 F. Supp. 2d at 1007 (filing exemption certificates with carriers indicated that cellular service provider acted as a collector).

In short, the undisputed facts show that 8x8 did not bear the economic burden of the tax payments it remitted to the IRS but was instead a "person who collected" the FCET under I.R.C. § 6415(a). Therefore, because it did not repay the tax to its customers or get their consent to request a refund, 8x8 lacks standing to request a refund of those taxes.

7

### 2.     8x8's Arguments

Notwithstanding that it did not bear the economic burden of the taxes it remitted to the IRS, 8x8 argues that it may obtain a refund of the taxes it collected from its customers on the grounds that it bore "the legal incidence of the tax" as a "transferee reseller" of prepaid telephone card (PTC) services under Treas. Reg. § 49.4251-4. See Pl.'s Opp'n to Def's Cross-Mot. for Summ. J. and Reply to Def.'s Opp'n to Pl.'s Mot. (Pl.'s Reply) at 12–16, ECF No. 41. Further, according to 8x8, guidance that the IRS issued in the wake of the circuit court decisions described above confirms that, because it was liable to pay the tax as the transferee reseller of such services, it was entitled to secure the refund of the wrongfully paid FCET. See id. (citing I.R.S. Notice 2006-50 (guidance); I.R.S. Notice 2007-11, 2007-5 I.R.B. 405–09 (expanding and clarifying on the guidance found in Notice 2006-50)). These contentions lack merit.

### a.     <u>Legal Incidence of the Tax</u>

The applicable regulations specify that a "prepaid telephone card" is a "card or similar arrangement that permits its holder to obtain a fixed amount of communications services by means of a code (such as a personal identification number (PIN)) or other access device provided by the carrier and to pay for those services in advance." See Treas. Reg § 49.4251-4(b); see also I.R.C. § 4251(d)(1), (3) (for purposes of applying excise tax "in the case of communications services acquired by means of a prepaid telephone card," the term "'prepaid telephone card' means any card or any other similar arrangement which permits its holder to obtain communications services and pay for such services in advance"). The regulations further state that the "holder" of the PTC is a person who purchases it "other than for resale," and that a "carrier" (as defined by reference to the Telecommunications Act) is "any provider of telecommunications services." Treas. Reg. § 49.4251-4(b) (referencing 47 U.S.C. § 153). They also specify that a "transferee" is "the first person that is not a carrier to whom a PTC is transferred by a carrier," and that a "transferee reseller" is "a transferee that purchases a PTC for resale." Id. Finally, the regulations impose liability for the FCET on the transferee.[6] See id. § 49.4251-4(d)(1).

As discussed below, the Court concludes that 8x8 is not a "transferee reseller" of "communications services acquired by means of a prepaid telephone card" because 8x8's customers did not receive their communications services by means of a PTC as defined in

---

[6] Thus, in cases involving communications services acquired by means of a PTC, if a carrier (i.e., a service provider) sells a phone card directly to a holder (i.e., a consumer), the holder/consumer is the transferee and pays the tax. But if the carrier sells a phone card to a transferee reseller (usually a wholesaler or distributor who purchases phone cards from a service provider at a discount and then sells them to consumers at face value), the transferee reseller (and not the holder/consumer) is liable for the tax and discharges its tax liability by paying the FCET to the carrier, which in turn remits the tax to the IRS. See Treas. Reg. § 49.4251-4(d)(1); see also Westside Cellular, 573 F. Supp. 2d at 1008.

the regulations. Therefore, contrary to 8x8's arguments, and consistent with its actions during the years in question, it never bore the legal incidence of the excise tax.

To begin with, 8x8's customers do not purchase a "fixed amount of communication services" when they purchase "domestic bundled" VoIP service. In the context of prepaid calling cards, a "fixed amount" of communication services is provided in the form of a specific number of minutes of calling time that are made available to the customer when the card is purchased (or reloaded). Thus, in the case of a prepaid phone card, the service provider bundles together a specific amount of calling time purchased from originating suppliers, sets the per-minute rate, and assigns the PIN that allows the customer to access the calling time that they have purchased. See Locus Telecomms., 99 Fed. Cl. at 644 (explaining the nature of the prepaid phone card industry); Ramirez v. Dollar Phone Corp., 668 F. Supp. 2d 448, 452 (E.D.N.Y. 2009) (same).

8x8, by contrast, provided its domestic bundled VoIP customers with "unlimited" calling time (which it further characterized as equivalent to some unspecified amount of "reasonable personal use" within a one month period). JS ¶ 21. This arrangement appears to contemplate that customers will receive precisely the opposite of a "fixed" amount of communication services, in that they are purchasing an essentially unlimited amount of such services which may be accessed for a fixed period (one month). Moreover, unlike a phone card, which must be replenished by an affirmative act of its holder, the communications services 8x8 provides are automatically renewed on a continuing basis until service is cancelled.[7] Thus, unlike a prepaid phone card, 8x8 did not offer its domestic bundled VoIP service customers a "fixed amount" of services within the meaning of Treas. Reg. § 49.4251-4(b).[8]

Next, as 8x8 conceded at oral argument, 8x8's customers did not receive a "code or other access device" from a carrier; instead, 8x8 supplied both their codes and their

---

[7] The Court notes that even if a customer's credit card were declined at the beginning of the month, 8x8 did not terminate the service for several weeks while it attempted to secure payment. See JS ¶ 18. This arrangement is also inconsistent with the notion that 8x8's customers were receiving a fixed amount of services on a "prepaid" basis in the same sense that holders of prepaid telephone cards do. Thus, in at least some circumstances, 8x8's customers received communications services for which they had not prepaid; such a result could never obtain with a prepaid telephone card.

[8] The parties' stipulation states that "8x8 offered business and residential 'unlimited' monthly domestic calling plans," and that "[t]he amount of service was limited to reasonable personal use within the one month period for which service had been prepaid." See JS ¶ 21. It further states that "[t]herefore, the unlimited plans provided a fixed amount of prepaid VoIP domestic services." Id. To the extent that the parties intended to stipulate that a "fixed amount of services" was provided within the meaning of Treas. Reg. § 49.4251-4(b), that stipulation is of no effect because the parties cannot stipulate to a legal conclusion. See Modeer v. United States, 183 Fed. App'x 975, 977 (Fed. Cir. 2006); Hegeman-Harris & Co. v. United States, 194 Ct. Cl. 574, 581 (1971).

access devices. The Court is not persuaded by 8x8's suggestion at oral argument that the prepaid phone card regulations might nevertheless apply because the relevant phrase in § 49.4251-4(b)—i.e., "a code . . . or other access device provided by the carrier"—could be read disjunctively, with the phrase "provided by the carrier" modifying "access device" but not "code." See Oral Argument at 19:30–55 (Feb. 9, 2016). This strained reading fails to account for the term "other," which indicates that the referenced "code" or PIN is among several possible "access device[s] provided by the carrier." Thus, the phrase plainly indicates that the code that provides access to the communications services must be supplied by the carrier. See Lengerich v. Dep't of Interior, 454 F.3d 1367, 1370 (Fed. Cir. 2013) ("We construe a regulation . . . by ascertaining its plain meaning." (citing Bowles v. Seminole Rock & Sand Co., 325 U.S. 410, 414–15 (1945))).

Finally, 8x8's service differed in material respects from a prepaid phone card because 8x8's customers (unlike purchasers of prepaid phone cards) had a continuing business relationship with 8x8. The prepaid phone card regulations contemplate that prepaid cards will allow their holders to make calls "without having to sign a contract with a telephone company and pay monthly bills." Westside Cellular, 573 F. Supp. 2d at 1008. Thus, when purchasing a prepaid phone card, a customer establishes no continuing relationship with the service provider and must contact the service provider again to buy more time when the initial calling time that they purchased runs out.

8x8's customers, by contrast, agreed to 8x8's extensive terms and conditions, were billed by 8x8 each month on an automatic basis, and were required to contact 8x8 only when they wished to terminate the otherwise automatically renewing service. They also had to purchase the domestic VoIP service as part of an overall package, which included items (such as international calls) that even 8x8 concedes were billed to their customers at the end of each month. These circumstances provide further support for the Court's conclusion that 8x8's terms of service did not constitute a "similar arrangement" to a prepaid phone card. See Westside Cellular, 573 F. Supp. 2d at 1008–09 (holding that the prepaid phone card regulations did not apply where "customers had to sign contracts" and the service provider "sent its customers monthly bills that itemized the services, including the federal excise tax").[9]

---

[9] In its reply brief, 8x8 contends that the existence of an ongoing relationship with its customers does not indicate that its service was not a "similar arrangement" to a PTC because Congress intended that certain arrangements such as joint venture credit cards be treated as "similar arrangements," and credit card companies maintain ongoing relationships with their customers. See Pl.'s Reply at 4–6. But, as the government points out, in a joint venture credit card arrangement, the credit card company purchases phone service from the carrier and then doles it out to its customers as a reward for using the card. See Def.'s Reply to Pl.'s Opp'n to Def.'s Cross-Mot. for Summ. J. at 16–17, ECF No. 46. Thus, while the user and the credit card company have an ongoing relationship, there is no ongoing relationship between the user and the telephone service provider, as there is here.

### b.   IRS Notice 2007-11

Finally, and in any event, even if 8x8 could be characterized as a "transferee reseller" of communication services acquired through prepaid telephone cards, 8x8 would still face the barrier that is imposed by I.R.C. § 6415(a) on tax collectors seeking a refund, as discussed above. Thus, 8x8 has cited no authority for the proposition that an entity that did not bear the economic burden of a tax, but instead collected the tax payment from others, may secure a refund without meeting the requirements of section 6415(a) because it bore "the legal incidence" of the tax. To the contrary, to secure a refund, a plaintiff must always show, at a minimum, that the government is holding money that rightfully belongs to him or her. As the Supreme Court noted in Lewis v. Reynolds, refunds under the tax laws are limited to overpayments. 284 U.S. 281, 283 (1932). It therefore follows that "the ultimate question presented for decision, upon a claim for refund, is whether the taxpayer has overpaid his tax;" that "[t]he action to recover on a claim for refund is in the nature of an action for money had and received;" and, therefore, that "it is incumbent upon the claimant to show that the United States has money which belongs to him." Id. (emphasis supplied) (quoting Lewis v. Reynolds, 48 F.2d 515, 516 (10th Cir. 1931)); see also Stone v. White, 301 U.S. 532, 535 (1937) (observing that "[t]he statutes authorizing tax refunds and suits for their recovery are predicated upon the same equitable principles that underlie an action in assumpsit for money had and received").

As is readily apparent, the United States is not holding money that belongs to 8x8 because 8x8 never remitted any of its own moneys to the IRS. The money that 8x8 remitted to the IRS belongs to its customers, from whom 8x8 collected it for purposes of having them (and not 8x8) pay the excise tax. In fact, the parties have stipulated that "[a] majority of 8x8's customers probably received refunds from the IRS of the [FCET] that 8x8 collected from them during the period." JS ¶ 27. Further, 8x8 executed Certificates of Exemption and provided them to its carriers precisely so that it would not have to pay any excise taxes. Therefore, even assuming for purposes of argument that 8x8 had borne the legal incidence of the excise tax, it lacks standing to request a refund of taxes that it never paid. See Westside Cellular, 573 F. Supp. 2d at 1008 (observing that even if plaintiff had provided services through a PTC, it would still lack standing to request a refund as a "transferee reseller" because it was undisputed that it never paid the excise tax and had avoided doing so by filing a Certificate of Exemption).

8x8's reliance upon IRS Notice 2007-11 for its argument that a transferee reseller may obtain the refund of a tax it did not actually pay is misplaced. See Pl.'s Mem. at 14–16. Section 6(c) of that Notice states as follows:

> The transferee is the person liable for the tax paid on a PTC and thus generally is the person eligible to request a credit or refund of the tax it paid. The carrier is eligible to request a refund only if it meets the conditions of section 5(d)(4) of Notice 2006-50 [which imposes the conditions for the refund of taxes to tax collectors that are set forth in section 6415(a)]. The holder is not liable for the tax and thus cannot request a credit or a refund.

First, there is no conflict between this issuance and the principles set forth above. Thus, the Notice allows a transferee to request a refund only of a "tax it paid." Even if 8x8 were able to persuade the Court that it was a transferee reseller of communications services acquired through a PTC, that legal finding would not alter the critical fact that 8x8 did not pay the taxes whose refund it seeks; its customers did. Moreover, even if there were some ambiguity in the Notice, the Court would decline to read it in a manner that would bring it into conflict with the aforementioned Supreme Court precedent or with section 6415. Smith v. Brown, 35 F.3d 1516, 1526 (Fed. Cir. 1994) (holding that regulations must be construed to avoid conflict with a statute if fairly possible).[10]

In short, the two Notices (2007-11 and 2006-50) were intended to provide a process for seeking a refund of taxes wrongfully paid in light of a series of court decisions rejecting IRS's interpretation of what constitutes "toll telephone service" for purposes of assessing the FCET. The Notices set forth rules of general application; they do not purport to create new refund request rights for tax collectors or others who did not bear the economic burden of paying the taxes in the first instance. Therefore, whether or not 8x8 is considered a provider of prepaid telephone cards within the meaning of the regulations, it is not entitled to the refund it requests in this case.

## CONCLUSION

For the reasons discussed above, the Court hereby **DENIES** 8x8's motion for summary judgment and **GRANTS** the government's cross-motion. The Clerk is directed to enter judgment accordingly. Each party shall bear its own costs.

**IT IS SO ORDERED**.

    /s/ Elaine D. Kaplan  
ELAINE D. KAPLAN  
Judge

---

[10] In addition, to the extent that 8x8's interpretation of the Notice conflicts with section 6415, the statute, of course, would be controlling. See Caldera v. J.S. Alberici Const. Co., 153 F.3d 1381, 1383 n.** (Fed. Cir. 1998) (observing that "[s]tatutes trump conflicting regulations").